**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| RESTAURANTS ACQUISITION I, LLC,[1] | Case No. 15-12406 (KG) |
| Debtor. | |

**DECLARATION OF W. CRAIG BARBER**
**IN SUPPORT OF CHAPTER 11 PETITION AND**
**FIRST DAY PLEADINGS OF RESTAURANTS ACQUISITION I, LLC**

I, W. Craig Barber, hereby declare under penalty of perjury:

1.      I am the President of Restaurants Acquisition I, LLC (the "Debtor") and have served in that capacity since December 28, 2008.

2.      I have over 30 years of management experience in the restaurant industry.  I am, and have been since April 2002, a member and President of Dynamic Management Company, LLC ("Dynamic Management"), an executive management firm that specializes in brand evolution, performance improvement, financial leadership, support and franchise services, as well as restructuring, turnaround and bankruptcy services.  Since 2002, Dynamic Management has provided executive leadership and support services to multiple companies operating a variety of restaurant brands in multiple states.  Dynamic Management has provided executive leadership and support services to the Debtor's business operations since December 28, 2008.  I am currently, and have been since November 2006, Chairman of the Board of Denny's Franchisee Association, which represents the interests of franchise restaurant owners and operators within the Denny's brand.  From 2005 to 2007, I was President of Barnhill's Buffet, Inc., and in such capacity was responsible for senior leadership and support functions for forty (40) of Barnhill's

---

[1] The Debtor's mailing address is 313 East Main Street, Suite 2, Hendersonville, TN.  The last four digits of the Debtor's tax identification number are 8761.

Buffet restaurants in seven (7) states. From 2000 to 2002, I was President of Phoenix Restaurant Group, Inc. ("PRG"), a publically traded company that, during most of that time, owned over one hundred ninety (190) restaurants, including the Denny's and Black-eyed Pea brands. Prior to that, between 1983 and 1997, I served in various capacities at Shoney's Inc. ("Shoney's"), another publically traded company that, during the time, operated and franchised over one thousand four hundred seventy five (1,475) multi-concept restaurants in thirty four (34) states, nine hundred and fifty (950) of which were company owned. I began as Assistant Treasurer at Shoney's in July 1983 and was named Treasurer in 1988, Chief Financial Officer in 1992 and Chief Administrative Officer in 1996. Before that, from 1977 to 1983, I was an Audit Manager at Ernst & Young and supervised audits of large, public entities, primarily in the life insurance, health care and restaurant industries.

3.    Concurrently with the filing of this declaration (the "Declaration") on the date hereof (the "Petition Date"), the Debtor has filed in the United States Bankruptcy Court for the District of Delaware (the "Court") a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), commencing the above-captioned chapter 11 case (the "Chapter 11 Case").

4.    The Debtor has requested certain relief in "first day" applications and motions filed with the Court (collectively, the "First Day Pleadings")[2] in order to minimize potential adverse effects of the commencement of the Chapter 11 Case and to maximize the value of its estate. I submit this Declaration to assist the Court and parties-in-interest in understanding the circumstances that led to the commencement of the Chapter 11 Case and in support of the Debtor's chapter 11 petition for relief and the First Day Pleadings.

---

[2] Capitalized terms used but not defined herein have the meanings ascribed to them in the respective First Day Pleadings.

5.      Except as otherwise indicated herein, all facts set forth in this Declaration are based on my personal knowledge, my discussions with other members of the Debtor's management team and other personnel, my knowledge and review of relevant documents including the Debtor's books and records, or my opinion based on my experience, knowledge, and information concerning the Debtor's operations and financial condition.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.  I am authorized to submit this Declaration on behalf of the Debtor.

6.      I am familiar with the contents of each First Day Pleading (including the exhibits to each) and the facts set forth therein are true and correct to the best of my knowledge.  The relief sought in each First Day Pleading will allow for an orderly transition of the Debtor into the Chapter 11 Case and ultimately permit the Debtor to reorganize and maximize the value of its business.  Further, it is my belief that the relief sought in the First Day Pleadings is in each case narrowly tailored and necessary to achieve the goals identified above, and, accordingly, best serves the interests of the Debtor's estate and stakeholders.

7.      Parts I and II of this Declaration provide an overview of the Debtor's business and of the Debtor's organizational and capital structure.  Part III provides an overview of the circumstances leading to the commencement of the Chapter 11 Case.  Part IV discusses the objectives of the Chapter 11 Case, and Part V discusses the bases for relief sought in the First Day Pleadings, which the Debtor believes are critical to administering the Chapter 11 Case and preserving and maximizing the value of the Debtor's estate.

## I.      Description of the Debtor

### A.      The Debtor's Business

8.      The Debtor operates a chain of full-service restaurants throughout Texas, largely located in the Dallas-Fort Worth and Houston metropolitan area, operating under the trade-

names Black-eyed Pea and Dixie House.  Through its restaurants, the Debtor also provides its customers and patrons with on and off premises dining along with catering services.

9.      The Black-eyed Pea concept was founded in 1975 as one of the first casual dining concepts to focus on regional Texas cuisine with high quality, flavorful and freshly prepared food offerings at an exceptional value - - the current check average is less than $11 per guest.  At one point in its history, the Black-eyed Pea had one hundred fifty (150) restaurants in six (6) states with seven (7) franchisees.

10.      Over the last twenty (20) years, the Black-eyed Pea concept has been owned and/or operated by several entities.  Most recently, from 1996 to 2002, the concept was owned by PRG.  However, in 2002, in connection with PRG's chapter 11 reorganization, the Black-eyed Pea concept was transferred to the Debtor in furtherance of PRG's reorganization.

11.      As of January 1, 2015, thirty (30) Black-eyed Pea restaurant locations were in operation throughout Texas (generally, the "Prepetition Stores").  The Debtor is the lessee of twenty-seven (27) of the Prepetition Store locations (the "RAI Prepetition Stores"). Two (2) of the Prepetition Store locations are leased by the Debtor's non-debtor affiliate Texas Pea, LLC ("Texas Pea"). The remaining Prepetition Store location is leased by BEP America, LLC ("BEP America"). The Debtor provides operational oversight for the Texas Pea and BEP America Stores (together, the "Non-Debtor Prepetition Stores") pursuant to operating agreements with each of Texas Pea and BEP America.

12.      However, as of the Petition Date, the Debtor has closed and vacated fifteen (15) Prepetition Stores (the "Non-Core Stores").[3]  The Debtor continues to operate fifteen (15) of the Prepetition Stores (the "Core Stores"), though it is currently locked out of one (1) of these Core

---

[3] The Debtor has been locked out of four (4) of the Non-Core Stores by its landlords for non-payment of rents.

Stores by its landlord for non-payment of rent. Accordingly, as of Petition Date, the Debtor operates thirteen (13) open restaurants operating under trade-name Black-eyed Pea and one (1) operating under the trade-name Dixie House.

13.    The Debtor has determined that fifteen (15) Core Stores represent the base of restaurant locations that will provide a stable base of cash flow production that supports the Debtor's reorganization.[4] For the reasons described below, the Debtor intends to reject the leases for the Non-Core Stores.[5]

14.    Prior to being locked out of and/or closing the Non-Core Stores, the Debtor employed approximately 1,800 employees and staff at an average monthly payroll of $1,494,912.00.  As of the Petition Date, after taking into consideration the closing of the Non-Core Stores, the Debtor employs approximately 950 employees and staff, which the Debtor expects will result in an average monthly payroll of $628,333.00.

15.    Each of the Core Stores and Non-Core Stores are leased by the Debtor or, in certain instances, by an affiliate of the Debtor, pursuant to a lease agreement with the property owner (collectively, either the "Core Store Leases" or "Non-Core Store Leases").

16.    The Debtor's business operations are, and have been, managed by Dynamic Management pursuant to a Management Agreement dated as of December 28, 2008 (the "Current Management Agreement").  Dynamic Management also managed the Debtor's business operations during fiscal years 2002 through 2004 pursuant to a management with the then owner of the Debtor.

---

[4] The Core Stores include fourteen (14) RAI Prepetition Stores (including the one (1) RAI Prepetition Store that is currently subject to lock out) and the BEP America Prepetition Store.

[5] The Non-Core Stores include the two (2) Texas Pea Prepetition Stores. Accordingly, this Motion seeks to reject thirteen (13) Non-Core Store Leases of the Debtor. For the avoidance of doubt, by this Motion, the Debtor is not seeking to affect any right or interest of any party with respect the Non-Debtor Prepetition Stores. The Debtor reserves all rights with respect to its ability to assume or reject its operating agreements with Texas Pea and BEP America concerning the Non-Debtor Prepetition Stores.

**B.      Corporate Formation and Organizational Structure**

17.      The Debtor is a limited liability company organized and existing under the laws of the State of Delaware.  A chart showing the organizational structure of the Debtor and its members and affiliates as of the Petition Date is attached hereto as **Exhibit A**.

18.      As reflected in the organizational chart, the Debtor's sole member is BEP 1&2, LLC ("BEP 1&2"), which is also a limited liability company organized and existing under the laws of the State of Delaware.   BEP 1&2 is wholly owned by BEP America, Inc. ("BEP America"), a Texas corporation.  BEP America acquired its interest in BEP 1&2 on December 28, 2008.  BEP 1&2 acquired its ownership interest in the Debtor in 2002.

19.      As reflected in the organizational chart, the Debtor is the sole member of RAI Holdings, LLC ("RAI Holdings"), a Delaware limited liability company. RAI Holdings, in turn, is the sole member of RAI Beverages, LLC ("RAI Beverages"), a Texas limited liability.  RAI Beverages maintains, operates and conducts the dispensing and sale of alcoholic beverages for the on-premises consumption of the Debtor's customers and patrons.  The Debtor's relationship with RAI Beverages is governed by a Beverage Concession Management Agreement effective as of May 19, 2008.

20.      The Debtor maintains two offices: (i) 1301 E. Corporate Drive, Suite A, Arlington TX 76006, which is the Texas primary place of business; and (ii) 313 E. Main ST, Suite 2, Hendersonville, TN 37075, which is the location of support services provided to Debtor and the Debtor's mailing address.

## II.        Prepetition Capital Structure[6]

21.       As of the Petition Date, the Debtor's unaudited balance sheets reflected total assets of approximately $8,500,000.00 and total liabilities of approximately $12,500,000.00. The Debtor's debt obligations consist of approximately $2.44 million in loans under a secured credit agreement with CNL Financial Group, Inc. ("CNL"), approximately $1.42 million in loans owed to Grove Family Investments, L.P. ("Grove Family Investments"), approximately $850,000 owed to American Express Bank, FSB ("AmEx Bank") under a business and loan security agreement and approximately $2,173,580.66 in trade debt.

### A.        Secured Debt

22.       The Debtor and CNL are parties to that certain Secured Credit Agreement dated as of December 28, 2008 (as further amended, restated, supplemented, or otherwise modified from time to time, the "Prepetition CNL Credit Agreement"), pursuant to which the Debtor borrowed $2,343,850.00 (the "CNL Credit Facility").   Under the Prepetition CNL Credit Agreement, the Debtor pledged certain of its assets as collateral to secure the CNL Credit Facility.  As of the Petition Date, the principal amount outstanding under the Prepetition CNL Credit Agreement remains $2,343,850.00.  Pursuant to the Prepetition CNL Credit Agreement, the borrowings under the CNL Credit Facility bear interest at a rate per annum of 5% per annum. The CNL Credit Facility matures on December 31, 2015.

23.       The Debtor and AmEx Bank are parties to that certain Business Loan and Security Agreement dated as of May 5, 2015 (the "AmEx Loan Agreement"), pursuant to which the Debtor borrower $1,200,000.00 (the "AmEx Advance").   Under the AmEx Loan Agreement, the Debtor pledged certain of its assets as collateral to secure the AmEx Advance.  As of the

---

[6]The following summary is qualified in its entirety by reference to the operative documents, agreements, schedules, and exhibits.

Petition Date, the approximate amount due and owing under the AmEx Loan Agreement was $850,000.00.  The AmEx Loan Agreement does not have an interest rate.  Instead, the Debtor is obligated to repay the Loan and Fee (as defined in the AmEx Loan Agreement) at a Repayment Rate (as defined in the AmEx Loan Agreement) of 33% of all Settlement Amounts (as defined in the AmEx Loan Agreement).  The AmEx Loan Agreement matures in May 2017.

**B.      Unsecured Debt**

**a.      Grove Family Investments**

24.      The Debtor and Grove Family Investments are parties to that certain Loan Agreement dated as of December 22, 2010 (as further amended, restated, supplemented, or otherwise modified from time to time, the "Prepetition Grove Credit Agreement"), pursuant to which the Debtor borrower $2,500,000.00 (the "Grove Credit Facility").  The Debtor's obligations under the Prepetition Grove Credit Agreement are guaranteed by CNL, James M. Seneff, Jr. and Robert A. Bourne (collectively, the "Guarantors").  At the time, the individual were, upon information and belief, principals of CNL.  However, at least one is no longer affiliated with CNL.  None of the Guarantors are insiders or affiliates of the Debtor.

25.      The Prepetition Grove Credit Agreement expressly provides that the CNL Credit Facility and all amounts due and owing to CNL from the Debtor are subordinate to the Grove Credit Facility.  Moreover, pursuant to the loan documents evidencing the CNL Credit Facility, a default by the Debtor under the Prepetition Grove Credit Agreement constitutes and/or triggers a default under the Prepetition CNL Credit Agreement.

26.      The Debtor ceased making payments under the Prepetition Grove Credit Agreement after July 2015.  However, upon information and belief, these subsequent payments have been made by the Guarantors.  As of the Petition Date, the principal amount outstanding under the Prepetition Grove Credit Agreement is $1,420,000.00.  The borrowings under the

Grove Credit Facility bear interest at a rate per annum of 12%.  The Grove Credit Facility matures on December 31, 2015.

### b.      Trade Debt

27.      As of the Petition Date, as noted above, the Debtor estimates that it has approximately $3,923,580.00 of unsecured trade debt and other outstanding operating expenses, including, but not limited to, rent, general operating payables and past-due taxes.

## III.      Events Leading to Commencement of the Chapter 11 Cases

### A.      A Decline in EBITDA and Cash Flow And An Increase In Costs

28.      At its inception, in fiscal year 2002, and through fiscal year 2004, the Debtor produced positive cash flow.  However, the results of operation for fiscal year 2007 and fiscal year 2008 were earnings before interest, taxes, depreciation and amortization ("EBITDA") of ($1,216,000.00) and ($925,000.00), respectively.  As a consequence, between 2006 and 2008, the Debtor received capital contributions from prior owners of $7.75 million to sustain its operations.

29.      When BEP America took control of the Debtor on or about December 28, 2008, the Debtor was subject to $4 million of funded debt, which was clearly beyond the capacity of the Debtor to repay given the results of the Debtor's operations in fiscal years 2007 and 2008 noted above.  The CNL Credit Facility provided an additional $1 million line of credit to support its operations subsequent to the transition of ownership.

30.      Beginning in 2009, under management again by Dynamic Management, results of the Debtor's operations improved.  From fiscal year 2008 through fiscal year 2013, EBITDA increased from $480,000.00 to $1.1 million, respectively, and store level cash flow before occupancy costs increased from 15.4% of revenues to 19.0% of revenues, respectively.  This

performance improvement was achieved despite capital constraints and the Debtor having limited funds available for marketing,

31.    However, in November and December of fiscal year 2013, two (2) events occurred that were the genesis of a decline in the Debtor's cash flow performance.  On November 18, 2013, without notice or advance warning, the Debtor's former credit card processor failed to remit over $250,000.00 of credit card receipts for an alleged credit card security compliance matter.  The Debtor expended considerable effort and incurred over $100,000.00 in legal fees to compel the return of these funds.  Then, during the first two (2) weeks of December 2013, a weather event in Dallas, Texas, negatively impacted revenues by over $200,000.00, which represented 1.6% of revenues for that quarter.  The sudden loss of a substantial portion of liquidity during November 2013 due to the credit card dispute along with the legal fees related thereto, coupled with the December 2013 weather event had a negative impact on the Debtor's revenues and cash flow.  These events also caused a disruption in the Debtor's marketing cycle, which again, was being funded at substantially below industry level standards.

32.    As a direct result of these events, store level cash flow before occupancy declined from $8.5 million in fiscal year 2013 to $7.2 million in fiscal year 2014 and $6.7 million for the trailing thirteen periods ending September 6, 2015.  At the same time, the Debtor's occupancy costs increased from 10.8% of revenues in fiscal year 2012 to 12.8% of revenues in fiscal year 2014, further eroding the Debtor's profitability.  Under these circumstances, despite the Debtor's best efforts, the Debtor began to fall behind on its obligations to creditors.

33.    As of the Petition Date, approximately $1,750,00.00 was due and owing to various landlords for the pre-petition period associated with RAI Prepetition Stores.  Further, due

to the Debtor's failure to pay certain landlords, as of the Petition Date, the Debtor was locked out of five (5) of its stores, one (1) of which the Debtor considers to be a Core-Store.  In addition, as of the Petition Date, at least one (1) creditor had commenced an action against the Debtor in Texas state court seeking to recover amounts allegedly due and owing to the creditor and has been particularly relentless in demanding payment and interfering with the Debtor's operations at the specific location where services were provided.  Other creditors have filed mechanics and materialman's liens for services performed at a number of the Debtor's stores.

34.    The Debtor's liquidity crisis also caused it to fall behind on its payments to various taxing authorities, including, but not limited to, the Federal Government.  A Federal Tax Lien was filed against the Debtor on August 18, 2015, on account of unpaid employer withholding taxes for the tax periods ending December 31, 2014 and March 31, 2015. According to the Federal Government, as of August 5, 2015, before the application of penalties and interest, the Debtor's liability was $863,168.67 (the "Federal Withholding Tax Liability"). The Debtor has agreed to repay the Federal Withholding Tax Liability and the Federal Government has agreed to accept repayment in monthly installments of $10,000, which commenced on October 1, 2015.  Approximately $866,000.00 is due and owing to other taxing authorities for the pre-petition period, excluding the Alleged Texas Sales and Use Tax Liability for 2002-2005 (as defined below).

35.    Additionally, the Debtor has been embroiled in a dispute with the State of Texas since 2007 over the results of and methodology used by the State of Texas in conducting a sales and use tax compliance audit for the tax period May 1, 2002 through December 21, 2005, which resulted in the State of Texas recording a State Tax Lien against the Debtor on October 9, 2013 in the amount of $966,348.19 (the "Alleged Texas Sales and Use Tax Liability for 2002-2005").

The Debtor disputes the Alleged Texas Sales and Use Tax Liability for 2002-2005 and, after exhausting all administrative channels available to challenge the assessed liability, commenced an action against the Comptroller of Public Accountants of the State of Texas and the Attorney General of the State of Texas.  That action remains pending.

**B.    Exploration of Restructuring Alternatives**

36.    In December 2013, the Debtor engaged an investment banker to address the capitalization of the Debtor.  The process was slower than expected but, in July 2014, a confidential information memorandum was provided to 17 groups.  The Debtor received no offers as a result of this process.  Even with the Debtor's improved performance, the funded debt at the end of fiscal year 2014, which was $3.75 million, was almost four times EBITDA, which is beyond traditional lending standards (without regard for the higher than industry standard occupancy costs in excess of twelve percent (12%) of revenues).

37.    In August 2014, the Debtor executed a Lease Termination Agreement with one of its landlords for a restaurant located in Houston, Texas, that was to be developed into a multi-story condominium development.  Under the Lease Termination Agreement, the Debtor was to receive a $1.8 million lease termination payment.  Considering this particular restaurant's cash flow, which for fiscal year 2014 was $54,000, loss of the store was worth the expected lease termination payment, which the Debtor expected to receive in September 2014.  However, the lease termination was postponed several times and recently the landlord indicated that there is no longer a scheduled date for the termination.  If the anticipated lease termination had proceeded as anticipated, the Debtor's liquidity would have been significantly improved at a critical time relative to cash flow pressures and funding of critical initiatives.

38.     In April 2015, the Debtor engaged another investment banker to address a recapitalization or sale of the Debtor.  A confidential information memorandum was provided to more than ten (10) groups.  However, the Debtor received no offers as a result of this process.

39.     Given the Debtor's debt structure, and despite hiring two (2) investment bankers on a success fee basis, each of which also received retainers for their services, the Debtor was unable to access additional capital or find a potential purchaser.

### C.     The Determination To Seek Chapter 11 Relief

40.     As a result of the Debtor's liquidity crisis, coupled with its inability to attract new capital, achieve recapitalization of existing debt or sell the Debtor and/or its assets, the Debtor determined that a reorganization under chapter 11 of the Bankruptcy Code is the best way to maximize its value for its stakeholders while, at the same time, preserve the jobs of the vast majority of its employees.  The Debtor is confident that a reorganization will result in a healthy group of restaurants that will generate positive cash flow and facilitate a meaningful recovery to creditors.

### IV.    The Chapter 11 Case

41.     To position itself to achieve that goal, prior to the Petition Date, the Debtor evaluated each of the Prepetition Stores and the obligations associated with each.  The Debtor designated those restaurants that were profitable as Core Stores and those stores that were underperforming and burdened with higher than normal industry standard occupancy costs as Non-Core Stores.  On or before November 30, 2015, and in any event, prior to the Petition Date, the Debtor closed and vacated all Non-Core Stores it was not locked out of.  And, concurrently with the filing of this Declaration and the Debtor's chapter 11 petition, the Debtor has filed a motion with the Court seeking to reject the Non-Core Store Leases.  The Debtor believes that once it sheds itself of the burdens associated with the Non-Core Stores, it can focus its energy

and efforts on the Core-Stores.  The Debtor also believes that the Core Stores will be a set of successful stores which will provide sufficient cash to fund the Debtor's ordinary course expenses and is considering procurement of debtor-in-possession financing in order to help fund the its chapter 11 expenses.  The Debtor intends to reorganize itself around the Core Stores for the benefit of its creditors.  The Debtor also hopes that the Chapter 11 Case and the protections the Bankruptcy Code affords to landlords will encourage those landlords that have locked the Debtor out of any Core-Stores to re-engage in discussions with the Debtor so that these stores may be re-opened during the Chapter 11 Case or upon the Debtor's exit from chapter 11 as a reorganized company with a healthy balance sheet.

## V.    First Day Pleadings

42.    Concurrently with its chapter 11 petition, the Debtor is filing the following First Day Pleadings and other motions:

a.    Debtor's Motion for Entry of Order Granting (I) an Extension of Time to File Its Schedules and Statements and (II) Related Relief ("Motion To Extend Time");

b.    Debtor's Application for Entry of Order (I) Authorizing Employment and Retention of BMC Group, Inc. as Claims and Noticing Agent Effective *Nunc Pro Tunc* to Petition Date and (II) Granting Related Relief ("BMC Application");

c.    Debtor's Motion for Entry of Order (I) Authorizing Debtor to, in the Ordinary Course, (A) Use Its Cash Management System, Bank Accounts, and Business Forms and (B) Perform Intercompany Transactions, (II) Authorizing Banks and Financial Institutions to Honor and Process All Related Checks and Electronic Payment Requests, and (III) Granting Related Relief ("Cash Management Motion");

d.    Debtor's Motion for Entry of Order (I) Authorizing, but Not Directing, Debtor to (A) Maintain Existing Insurance Programs and Existing Insurance Premium Financing Agreement, and (B) Fund All Obligations in Respect Thereof, (II) Authorizing Banks and Financial Institutions to Honor and Process All Related Checks and Electronic Payment Requests, and (III) Granting Related Relief ("Insurance Motion");

e.      Debtor's Motion for Entry of Interim and Final Orders (I) Determining that Utility Providers Have Been Provided with Adequate Assurance of Payment, (II) Approving Proposed Adequate Assurance Procedures, (III) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Utility Services, (IV) Determining that Debtor is Not Required to Provide Any Additional Assurance, (V) Scheduling a Hearing to Consider Entry of a Final Order, and (VI) Granting Related Relief ("Utilities Motion");

f.      Debtor's Motion for Entry of Order (I) Authorizing Debtor to (A) Pay Pre-petition Wages and Other Compensation, and Employee Benefits, and (B) Continue Existing Employee Benefit Plans and Programs, (II) Authorizing Banks and Financial Institutions to Pay All Checks and Electronic Payment Requests, (III) Approving the Debtor's Discretionary Employee Incentive Programs, and (IV) Granting Related Relief ("Employee Wages Motion");

g.      Debtor's Motion for Entry of an Order (I) Authorizing, but Not Directing, Debtor to Pay Taxes and Fees, (II) Authorizing Banks and Financial Institutions to Honor and Process All Related Checks and Electronic Payment Requests, and (III) Granting Related Relief ("Tax Motion");

h.      Debtor's Motion for Authorization to (A) Continue Customer Programs in the Ordinary Course of Business and (B) Otherwise Honor Pre-Petition Obligations Related Thereto ("Customer Programs Motion");

i.      Debtor's Motion for Entry of Order (I) Authorizing, but Not Directing, Payment of Critical Vendor Claims in the Ordinary Course of Business, and (II) Authorizing Banks and Financial Institutions to Honor and Process All Related Checks and Electronic Payment Requests, and (III) Granting Related Relief ("Critical Vendors Motion");

j.      Debtor's Motion for Entry of an Order (I) Authorizing the Debtor to Pay Certain Pre-Petition Claims Arising Under the Perishable Agriculture Commodities Act, and (II) Granting Related Relief ("PACA Motion");

k.      Debtor's Motion for Entry of an Order Authorizing and Approving (A) Rejection of Certain Unexpired Leases of Nonresidential Real Property, Effective *Nunc Pro Tunc* to the Petition Date, and (B) Abandonment of Certain Personal Property ("Lease Rejection Motion");

l.      Debtor's Motion for Entry of Interim and Final Orders (A) Authorizing Postpetition Use of Cash Collateral, (B) Granting Adequate Protection to the Secured Lender, (C) Modifying the Automatic Stay, (D) Scheduling a

Final Hearing, and (E) Granting Related Relief ("Cash Collateral Motion");[7] and

m.   Debtor's Application to Retain and Employ Duane Morris LLP as Counsel to the Debtor and Debtor-in-Possession, *Nunc Pro Tunc* to the Petition Date ("Duane Morris Application").

43.   As noted above, the relief sought in the various First Day Pleadings will allow the Debtor to, among other things, (a) establish certain administrative procedures to promote a seamless transition into the Chapter 11 Case, (b) continue the Debtor's ongoing operations and preserve the viability of its businesses, (c) use cash collateral in the operation of the Debtor's businesses, and (d) protect the Debtor's assets and interests from any improper actions that may be taken by third parties.

44.   Several of the First Day Pleadings request authority to pay certain prepetition claims.   I am informed by the Debtor's advisors that Rule 6003 of the Federal Rules of Bankruptcy Procedure provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first 21 days following the filing of a chapter 11 petition, "except to the extent relief is necessary to avoid immediate and irreparable harm."   In light of this requirement, the Debtor has limited its request for immediate authority to pay prepetition claims to those circumstances where the failure to pay such claims will cause immediate and irreparable harm to the Debtor and its estate.

45.   Below is a brief discussion of the Debtor's First Day Pleadings and an explanation of why, in my belief, such motions are critical to the successful prosecution of the Chapter 11 Case.   More fulsome descriptions of the facts regarding the Debtor's operations, and the bases for the relief requested in the operational motions, can be found in each relevant First Day Pleading.

---

[7] The Debtor engaged with its secured lender concerning the use of Cash Collateral (as defined herein). The Debtor is hopeful it will be filing a consensual Cash Collateral Motion contemporaneously herewith.

A.        **Motion to Extend Time**

46.        Pursuant to the Motion to Extend Time, the Debtor seeks entry of an order (i) extending the time within which the Debtor must file its (a) statement of financial affairs, (b) schedule of assets and liabilities, (c) schedule of current income and expenditures, and (d) schedule of executory contracts and unexpired leases (collectively, the "Schedules and Statements"), and (ii) granting such other and further relief as requested. The Debtor has requested an extension of the time within which it must file its Schedules and Statements by thirty (30) days, without prejudice to the Debtor seeking further extensions of such time. While the Debtor has commenced the task of gathering the necessary information that will enable it to finalize the Schedules and Statements, the nature and scope of the Debtor's operations requires it to maintain voluminous records and intricate accounting systems. The Debtor also has limited staff available to perform the required internal review of such financial records and affairs. Thus, the scope of the Debtor's business, the limited staff available to perform the required preparation activities, the numerous critical operational matters that its accounting and legal personnel must address in the early weeks of the Chapter 11 Case, the pressures incident to the commencement of the Chapter 11 Case, and the fact that certain prepetition invoices have not yet been received or entered into its accounting systems provide ample cause justifying, if not necessitating, a 30-day extension of the deadline to file its Schedules and Statements.

47.        In addition, preparing and finalizing its Schedules and Statements within the next month will unnecessarily distract management's and the Debtor's professionals' attention from (a) focusing on the Debtor's business operations and reorganization efforts, including preservation of relationships with creditors and other parties-in-interest and (b) ensuring the Debtor's smooth transition into chapter 11 during a sensitive time.  Moreover, the proposed extension of the filing deadline will not prejudice creditors and other parties-in-interest because

the Debtor will work with the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") and any statutory committee appointed in the Chapter 11 Case to make available sufficient financial data and creditor information to permit at least an initial meeting, pursuant to section 341 of the Bankruptcy Code, to be timely held, if scheduled before the filing of its Schedules and Statements.

48.     In view of the amount of work entailed in completing the Schedules and Statements, and the competing demands upon the Debtor's employees, management, and professional advisors to maintain the operation of the Debtor's business during the initial post-petition period, the Debtor will not be able to properly and accurately complete the Schedules and Statements within the 14-day period following the Petition Date. At present, the Debtor anticipates that it will require a thirty (30) day extension of the current deadline to file the Schedules and Statements through and including February 2, 2015. Accordingly, I believe that the relief requested in the Motion to Extend Time is warranted, is in the best interests of the Debtor's estate, its creditors, and all other parties-in-interest, and is necessary to avoid immediate and irreparable harm to the Debtor and its estate.

### B.     BMC Application

49.     Pursuant to the BMC Application, the Debtor seeks an order (i) authorizing the employment and retention of BMC Group, Inc. ("BMC") as the claims and noticing agent (the "Claims and Noticing Agent") in this Chapter 11 Case, effective *nunc pro tunc* to the Petition Date, and (ii) granting such other and further relief as requested therein.  The Debtor obtained, reviewed, and undertook a competitive comparison of proposals from four claims and noticing agents, including BMC. I understand that such appointment is required by the rules of this Court. Moreover, such relief is prudent in light of the several hundred, and perhaps few thousand creditors, potential creditors, and parties-in-interest to whom certain notices will be sent. I

believe that BMC is fully equipped to handle the volume of mailing involved in properly sending the notices to, and processing the claims (if necessary) of, creditors and other interested parties in the Chapter 11 Case. I further believe that BMC's retention is the most effective and efficient manner of noticing these creditors and parties-in-interest of the filing of the Chapter 11 Case and other developments arising therein. Accordingly, I believe that the relief requested in the BMC Application is warranted and in the best interests of the Debtor's estate, its creditors, and all other parties-in-interest. [8]

### C. Cash Management Motion

50.    Pursuant to the Cash Management Motion, the Debtor seeks entry of an order (i) authorizing the Debtor to, in the ordinary course of its business, (a) authorizing the Debtor to, in the ordinary course of its business, (i) use the Cash Management System, Bank Accounts, and Business Forms (without reference to the Debtor's status as a debtor-in-possession) and (ii) perform Intercompany Transactions, (b) authorizing the Cash Management Bank to (i) maintain, service, and administer the Bank Accounts[9] and (ii) honor and process all related checks and electronic payment requests consistent with the relief requested herein, (c) waiving the Debtor's compliance with the guidelines set forth in section 345(b) of the Bankruptcy Code, and (d) granting such other and further relief as requested therein. The Debtor further requests that the Court authorize the Cash Management Bank to (a) continue to maintain, service, and administer the Bank Accounts, (b) debit the Bank Accounts in the ordinary course of business on account of (i) all checks drawn on the Bank Accounts that are cashed at the Cash Management Banks or

---

[8] The Debtor may, in the future, file a separate application to retain BMC to perform certain administrative services pursuant to section 327 of the Bankruptcy Code.

[9] The Debtor believes that **Exhibit C** to the Cash Management Motion sets forth a complete list of Bank Accounts. Nevertheless, the Debtor requests that the Order granting the relief sought in the Cash Management Motion apply to all bank accounts that are actually a part of or are linked to the Debtor's Cash Management System. Thus, to the extent any Bank Account has been inadvertently omitted from the list, the Debtor requests that the order granting the relief sought in the Cash Management Motion apply to such account.

exchanged for cashier's checks by the payees thereof prior to the Petition Date, (ii) all checks or other items deposited in one of the Bank Accounts at the Cash Management Bank prior to the Petition Date that have been dishonored or returned unpaid for any reason, together with any fees and costs in connection therewith, and (iii) all undisputed pre-petition amounts outstanding as of the date hereof, if any, owed to any Cash Management Bank as service charges for the maintenance of any aspect of the applicable Cash Management System, and (c) recognize and give effect to the transfers between the various Bank Accounts as contemplated herein

51.     I believe that the relief requested in the Cash Management Motion is necessary and appropriate in order to avoid any interruptions to the operation of the Debtor's business and is necessary to avoid immediate and irreparable harm.  The Debtor has utilized the Cash Management System as part of its ordinary and usual business practices. I believe that authorizing the Debtor to, among other things, continue operating the Cash Management System, maintain existing Business Forms, and continue Intercompany Transactions is essential to the Debtor's operational stability and restructuring efforts.  I believe that the relief requested in the Cash Management Motion will help minimize any disruption in the Debtor's business operations during the period between the Petition Date and the Debtor's emergence from chapter 11 and preserve the value of the Debtor's estate.

52.     Moreover, I believe that allowing the Debtor to continue Intercompany Transactions, as well as to continue performing certain other *status quo* cash management operations, such as maintaining current Business Forms, will ensure (a) that the Debtor's businesses will be uninterrupted by the commencement of this bankruptcy and (b) the preservation of the viability of the Debtor's business, thereby allowing the efficient administration of the Chapter 11 Case and maximizing the value of the Debtor's estates. The

continued performance of the ordinary course Intercompany Transactions is integral to ensure the Debtor's ability to operate its business and preserve and maintain the Debtor's going-concern value for the benefit of all parties in interest.[10]  Because the Debtor's businesses are operationally and functionally interconnected, they maintain the centralized Cash Management System described above that necessarily requires numerous Intercompany Transactions.  Altering this system would require the Debtor to divert its attention from its restructuring efforts and the desired smooth transition into operating as a debtor-in-possession.  In contrast, the continuation of the Intercompany Transactions helps preserve the "business as usual" atmosphere and avoids the unnecessary distractions that inevitably would be associated with any substantial disruption in the Cash Management System. Accordingly, I believe that the relief requested in the Cash Management Motion is warranted, is in the best interests of the Debtor's estate, its creditors, and all other parties-in-interest, and is necessary to avoid immediate and irreparable harm to the Debtor and its estate.

### D.    Insurance Motion

53.    Pursuant to the Insurance Motion, the Debtor requests entry of an order (a) authorizing, but not directing, the Debtor to (i) maintain the Insurance Programs and the Premium Financing Agreement on an uninterrupted basis in accordance with its historical practices, (ii) fund all Insurance Obligations, whether relating to the prepetition or post-petition period up to the Insurance Obligations Cap, including reimbursing BEP America for payments made by BEP America in satisfaction of such Insurance Obligations, (b) authorizing financial institutions to honor and process all checks and electronic payment requests related to the

---

[10] Because the Debtor engages in Intercompany Transactions on a regular basis, and such transactions are common among enterprises similar to the Debtor, the Debtor believe that the Intercompany Transactions are ordinary course transactions within the meaning of section 363(c)(1) of the Bankruptcy Code that do not require the Court's approval. Nonetheless, out of an abundance of caution, the Debtor is seeking express authority to engage in such transactions after the Petition Date.

foregoing, and (c) granting such other and further relief as is requested herein or as the Court otherwise deems necessary or appropriate.

54.     I believe that the relief requested in the Insurance Motion will help minimize any disruption in the Debtor's business operations during the period between the Petition Date and confirmation of a chapter 11 plan, as well as after its emergence from chapter 11, thereby preserving the value of the Debtor's estate. It is essential for the Debtor to carry insurance in its day-to-day operations, or it runs the risk of, among other harms, incurring financial responsibility and legal liability for potential occurrences not covered by insurance.  Moreover, in many cases, coverage provided by the Insurance Policies is required by the regulations, laws, and contracts that govern the Debtor's commercial activities.

55.     Even a brief delay or suspension in the Debtor's ability to pay the Insurance Obligations could create significant risk that the Debtor would void or otherwise lose the benefits of the Insurance Programs.  Disruption of the Debtor's insurance coverage would expose the Debtor to serious risks, including possibly (a) incurring direct liability for the payment of claims that otherwise would have been payable by the Insurance Carriers under the Insurance Programs, (b) incurring material costs and other losses that otherwise would have been reimbursed by the Insurance Carriers under the Insurance Programs, (c) losing good-standing certification to conduct business inasmuch as the jurisdiction in which it operates requires the Debtor to maintain certain levels of insurance coverage, (d) being unable to obtain similar types of insurance coverage, and (e) incurring higher costs for re-establishing lapsed policies or obtaining new equivalent coverage.

56.     If the Insurance Programs lapse, the Debtor will be required to obtain replacement insurance, likely at a cost greater than the cost of the current Insurance Programs.  Furthermore,

replacing the Insurance Programs would divert the time and resources of the Debtor's directors and officers away from the restructuring process.  Accordingly, I believe that the relief requested in the Insurance Motion is warranted, is in the best interests of the Debtor's estate, its creditors, and all other parties-in-interest, and is necessary to avoid immediate and irreparable harm to the Debtor and its estate.

### E.    Utilities Motion

57.    Pursuant to the Utilities Motion, the Debtor requests entry of an order (a) determining that the Utility Providers have been provided with adequate assurance of payment within the meaning of section 366 of the Bankruptcy Code by virtue of the Proposed Adequate Assurance, (b) approving the Adequate Assurance Procedures as proposed herein, (c) prohibiting the Utility Providers from altering, refusing, or discontinuing Utility Services on account of prepetition amounts outstanding or on account of any perceived inadequacy of the Adequate Assurance Procedures, (d) determining that the Debtor is not required to provide any additional assurance beyond what is proposed in this Motion, (e) scheduling the Final Hearing to consider entry of the Final Order, and (f) granting such other and further relief as requested herein or as the Court otherwise deems necessary or appropriate.

58.    I believe the relief requested in the Utilities Motion is necessary and appropriate to avoid immediate and irreparable harm because uninterrupted Utility Services are essential to the Debtor's ongoing operations and the viability of its business and, therefore, are essential to the success of the Debtor's reorganization.  If the Utility Providers refuse or discontinue service, even for a brief period, the Debtor will suffer immediate and irreparable harm, and the disruption will cause potential safety hazards.  Thus, it is imperative that the Utility Providers continue to provide their Utility Services without interruption.

59.     I believe that the Utility Providers have "adequate assurance of payment" even without the proposed Adequate Assurance Deposit.  I believe that the Debtor has sufficient availability of funds to pay these amounts in the ordinary course of business by virtue of cash reserves, expected cash flows from business operations, and/or debtor-in-possession financing received from a post-petition lender.[11]  I therefore anticipate that the Debtor will have sufficient resources to pay, and intends to pay, any and all valid post-petition obligations for Utility Services in a timely manner.  Moreover, I believe that the Debtor's reliance on Utility Services for the operation of its business provides it with a powerful incentive to stay current on its utility obligations.

60.     In addition, I am informed and believe that the proposed Adequate Assurance Procedures are consistent with procedures that courts in this district have regularly approved in other chapter 11 cases. If they are not approved, the Debtor could be forced to address payment requests by Utility Providers in a disorganized manner, which would distract management from focusing on the Debtor's reorganization.  Moreover, on the 30th day following the Petition Date, the Debtor could be surprised by a Utility Provider unilaterally (a) deciding that it is not adequately protected, (b) making an exorbitant demand for payment to continue service, or (c) discontinuing service.  Such discontinuation of or higher payment demands for Utility Services could jeopardize the Debtor's reorganization efforts. Accordingly, I believe that the relief requested in the Utilities Motion is warranted, is in the best interests of the Debtor's estate, its creditors, and all other parties-in-interest, and is necessary to avoid immediate and irreparable harm to the Debtor and its estate.

---

[11] The Debtor is exploring various debtor-in-possession financing opportunities and expects to file, either contemporaneously with the filing of the First Day Motions or soon thereafter, a motion seeking authority to use cash collateral.

**F.      Employee Wages Motion**

61.      Pursuant to the Employee Wages Motion, the Debtor requests entry of an order (a) authorizing the Debtor to pay, in its sole discretion, all payments required under or related to Employee Compensation; (b) authorizing the Debtor to continue to satisfy or honor, in its sole discretion, the Employee Benefits and all costs incident to the foregoing, and to continue to honor its practices, programs and policies for its Employees, as those practices, programs and policies were in effect as of the Petition Date and as such practices, programs and policies may be modified, amended, or supplemented from time to time in the ordinary course of the Debtor's business; and (c) authorizing and directing the applicable Disbursement Banks to receive, process and pay any and all checks drawn on the Debtor's Disbursement Accounts, and automatic payroll transfers to the extent that those checks or transfers relate to any of the foregoing; and (d) approving the Discretionary Employee Incentive Programs.

62.      Additionally, the Debtor seeks authority, upon entry of a final order, to honor, pay, satisfy, or remit all claims and pre-petition obligations related to the Employee Incentive Programs.

63.      The Debtor is not seeking to satisfy the Employee Obligations in amounts that exceed the Statutory Cap in the aggregate per Employee. Accordingly, granting the relief sought with respect to compensation affects only the timing of payments to Employees. Indeed, payment of Employee Obligations up to the Statutory Cap per individual will enhance value for the benefit of the Debtor' estate because it will help ensure that the Employees-- the lifeblood of the Debtor's business operations--will continue to provide vital services to the Debtor at this critical juncture. In addition, to the extent that the Debtor is authorized, in a reasonable exercise of its business judgment, to honor or satisfy the Employee Obligations

on a postpetition basis in the ordinary course of business, such payments will enhance the value of the Debtor's estate by preserving the going-concern value of the Debtor's business.

64.    The Debtor also seeks authority to pay Payroll Taxes and other Deductions to the appropriate entities.    These amounts principally represent Employee earnings that Employees, governments and judicial authorities have designated for withholding from Employees' paychecks.    In addition to causing undue hardship to certain Employees, the failure to pay such Payroll Taxes and Deductions may result in the Debtor being inundated with inquiries from taxing authorities and garnishors regarding its failure to submit, among other things, taxes and child support and alimony payments, which are not the Debtor's property but have been withheld from Employee paychecks.    Moreover, if the Debtor cannot remit these amounts, the affected Employees may face legal action and/or imprisonment due to the Debtor's failure to submit these payments.

65.    The relief requested in the Employee Wages Motion will benefit the Debtor's estate and creditors by allowing the Debtor's business operations to continue without interruption while the Debtor seeks to consummate its proposed restructuring.    Absent such payments, the Employees may seek alternative employment opportunities.    Such a development will deplete the Debtor's workforce, hinder or preclude the Debtor's ability to meet its customer obligations at a time when the Debtor seeks to conduct operations in a "business as usual" manner.    Accordingly, I believe that the relief requested in the Employee Wages Motion is warranted, is in the best interests of the Debtor's estate, its creditors, and all other parties-in-interest, and is necessary to avoid immediate and irreparable harm to the Debtor and its estate.

**G.    Tax Motion**

66.    Pursuant to the Tax Motion, the Debtor requests entry of an order (a) authorizing, but not directing, the Debtor to pay or fund any unpaid Taxes and Fees, whether arising

prepetition or post-petition, as such Taxes and Fees become due in the ordinary course of business, up to the Taxes and Fees Cap, (b) authorizing banks and financial institutions to honor and process all checks and electronic payment requests relating to the foregoing, and (c) granting such other further relief as requested herein or as the Court otherwise deems necessary or appropriate.

67.     I believe that the relief requested in the Tax Motion is necessary and appropriate because the Debtor's failure to pay prepetition Taxes and Fees could materially and adversely impact their business operations, impair the value of the Debtor's estate, and threaten the Debtor's reorganizations in several ways.  First, the Taxing Authorities could initiate additional audits of the Debtor or prolong existing audits, which would unnecessarily divert the Debtor's focus and attention from the tasks required by the reorganization process at a critical time for its business.  Second, the Taxing Authorities may attempt to suspend the Debtor's operations, or the operations of its affiliates, file liens, seek to lift the automatic stay, and/or pursue other remedies that not only would be administratively burdensome to the Debtor's estate, but could also have disastrous consequences on the Debtor's business operations.  Third, the Debtor's failure to pay such Taxes or Fees to the Taxing Authorities, or to fund such payments with respect to its affiliates, could cause the Debtor or its affiliates to incur late fees, penalties, and other charges.

68.     I believe that the Debtor has sufficient availability of funds to pay these amounts described in the Tax Motion in the ordinary course of business by virtue of cash reserves, expected cash flows from business operations, and/or debtor-in-possession financing received from a post-petition lender.  Accordingly, I believe that the relief requested in the Tax Motion is warranted, is in the best interests of the Debtor's estate, its creditors, and all other parties-in-interest, and is necessary to avoid immediate and irreparable harm to the Debtor and its estate.

### H.    Customer Programs Motion

69.    Pursuant to the Customer Programs Motion, the Debtor requests authority, but not direction, to (a) maintain and administer its Customer Programs and (b) honor all pre-petition obligations owing on account of its Customer Programs in the ordinary course of business and in a manner consistent with past practice.

70.    I believe that the relief requested in the Customer Programs Motion is necessary and appropriate to preserve the value of the Debtor's estate with respect to the Debtor's current and remaining operations.  The Debtor operates in a highly competitive sector and the success and viability of the Debtor's business is dependent upon the loyalty and confidence of its customers. Prior to the Petition Date, the Debtor conducted its Customer Programs as part of the ordinary course of its business.

71.    I believe that the ability to maintain the Customer Programs is critical for the Debtor to retain its most valuable customers, which are integral to the Debtor's operations.  If the Debtor is unable to honor its obligations arising from the Customer Programs, it risks losing customers to its competitors. Given that any interruption or discontinuation of the Customer Programs could have a devastating effect on the Debtor's business, I believe that the resulting benefits to the Debtor's stakeholders of granting the relief requested in the Customer Programs Motion will far exceed any costs associated with the Customer Programs.  Considering the potential loss of customer loyalty, goodwill and revenue absent the relief requested herein, the continuation of the Customer Programs is essential to the ongoing vitality of the Debtor's business. Accordingly, I believe that the relief requested in the Customer Programs Motion is warranted, is in the best interests of the Debtor's estate, its creditors, and all other parties-in-interest, and is necessary to avoid immediate and irreparable harm to the Debtor and its estate.

I.      **Critical Vendors Motion**

72.     Pursuant to the Critical Vendors Motion, the Debtor requests entry of an order (a) authorizing, but not directing, the Debtor to pay the Critical Vendor Claims, whether arising pre-petition or post-petition, as such claims become due in the ordinary course of business, up to the Critical Vendor Cap, (b) authorizing banks and financial institutions to honor and process all related checks and electronic payment requests, and (c) granting such other and further relief as requested herein or as the Court otherwise deems necessary or appropriate. The Debtor further requests that it be authorized to condition, in its sole discretion, the payment of a Critical Vendor Claim on the agreement of the Critical Vendor to continue supplying goods and services to the Debtor on (a) terms that are as, or more, favorable to the Debtor as the Customary Trade Terms or (b) such other trade terms as are agreed to by the Debtor and the Critical Vendor.

73.     I believe the relief requested in the Critical Vendors Motion is necessary and appropriate because the nature of the Debtor's business and extent of its operations make payment on account of the Critical Vendor Claims essential to the preservation of the Debtor's business and value of the Debtor's estate for all creditors and parties-in-interest.   In order to avoid the potential erosion of value that will, in all likelihood, result from the refusal of certain Critical Vendors to continue doing business with the Debtor, I believe that it is imperative that the Debtor be authorized, but not directed, to pay the Critical Vendors in the ordinary course, whether or not the obligations to such creditors arise before or after the Petition Date.

74.     I further believe that a failure to pay the Critical Vendor Claims will, in all likelihood, have a material adverse impact on the day-to-day operations of the Debtor's business, as well as the ability of the Debtor to successfully emerge from chapter 11. Specifically, if the Debtor is not able to fulfill the Critical Vendor Claims, the Debtor's business will be threatened by the risk that vendors, agents, suppliers, and customers could terminate its relationships with

the Debtor or take other actions that could have a potentially deleterious effect on the Debtor's business as a whole, and the Debtor's ability to reorganize.

75.    In assessing strategies to continue doing business with the Critical Vendors, the Debtor has considered the availability of alternative protections for each Critical Vendor, such as prepayment and payment-in-advance or on-delivery.  Because many of the Critical Vendors are the only practical source of such goods and services, such payment alternatives are not available. The Debtor has, therefore, determined that paying the Critical Vendor Claims is the most effective way to ensure that such Critical Vendors will continue to (a) supply goods and services both now and in the future and (b) provide favorable credit terms to the Debtor as it enters into the Chapter 11 Case.

76.    The Debtor has reviewed its accounts payable and prepetition vendor lists in order to identify those creditors most essential to its operations during the Chapter 11 Cases, *i.e.,* the Critical Vendors.  The Debtor identified the Critical Vendors using the following criteria:  (a) whether certain quality specifications or other requirements of the Debtor's customers prevent the Debtor from obtaining a vendor's product(s) or service(s) from alternative sources within a reasonable timeframe; (b) whether, if a vendor is not a single source supplier, the Debtor has sufficient product in inventory to continue their operations while a replacement vendor is put in place; and (c) whether a vendor meeting the foregoing criteria is able or likely to refuse to ship product to the Debtor post-petition if its prepetition balances are not paid.

77.    As a result of the foregoing analysis, the Debtor managed to reduce its Critical Vendors to the following categories: food suppliers, marketing, and linens suppliers. In particular, the Debtor is contractually obligated to obtain at least eighty percent (80%) of its food orders through a single supplier.  That same supplier handles distribution for a number of the

Debtor's other vendors and suppliers. Given the limited number of significant food distributors supplying the large quantity of food required by the Debtor's day-to-day operations, I do not believe that it is either possible or practical to engage the services of other food distributors. Likewise, the Debtor relies on vendors to (i) maintain the menus for the Debtor's restaurant locations and other items containing the restaurants' logo, (ii) hold the artwork related to Debtor's menus and logos; and (iii) handle the e-mail marketing for the Debtor and hold the Debtor's e-mail marketing lists. Given the critical function of the menus and the use of the other items containing the restaurants' logo, and the importance of e-mail marketing in generating sales for the Debtor's restaurants in the ultra-competitive restaurant industry, if these vendors were to cease their services, the Debtor's ability to operate its restaurants on a day to day basis would be directly impacted. I believe the Debtor's linen suppliers are equally critical. These vendors provide linen service for the kitchen and front of the house service areas at each of the Debtor's restaurant locations and thus essential to day-to-day operations of the Debtor's restaurants. Accordingly, I believe that the relief requested in the Critical Vendors Motion is warranted, is in the best interests of the Debtor's estate, its creditors, and all other parties-in-interest, and is necessary to avoid immediate and irreparable harm to the Debtor and its estate.

**J.      PACA Motion**

78.      Pursuant to the PACA Motion, the Debtor requests entry of an order authorizing, but not directing, the Debtor, in its sole discretion, to pay (a) the PACA Claims up to a maximum aggregate of the PACA Claims Cap, and (b) granting such other and further relief as requested herein or as the Court otherwise deems necessary or appropriate.

79.      I believe that relief requested in the PACA Motion represents a sound exercise of the Debtor's business judgment, is necessary to avoid immediate and irreparable harm to the Debtor's estate, and will benefit the Debtor's estate and its creditors by allowing the Debtor's

business operations to continue without interruption. Specifically, I believe that the authority, but not direction, to satisfy the PACA Claims in the initial days of this Chapter 11 Case without disrupting the Debtor's business operations will send a clear signal to the marketplace, including key suppliers and customers, that the Debtor is willing and able to conduct business as usual during this Chapter 11 Case.

80.     In addition, I believe that any delays in satisfying amounts owed to PACA Vendors could adversely affect the Debtor's ability to obtain fresh produce, thereby undercutting the Debtor's reorganization prospects. In particular, I believe that the Debtor's failure to pay allowed PACA Claims in the ordinary course of business could subject the Debtor to numerous claims and adversary proceedings, including motions by PACA Vendors for relief from the automatic stay and/or injunctive relief, which would result in the unnecessary expenditure of time, effort and money by the Debtor. Finally, I understand that the relief requested in the PACA Motion affects only the timing of the payment of the PACA Claims, and will not prejudice the recovery of other creditors.  Instead, timely and immediate payment of the PACA Claims will provide the PACA Vendors with what they would be entitled to receive under a plan of reorganization, only without any interest costs that might otherwise accrue during this Chapter 11 Case. Accordingly, I believe that the relief requested in the PACA Motion is warranted, is in the best interests of the Debtor's estate, its creditors, and all other parties-in-interest, and is necessary to avoid immediate and irreparable harm to the Debtor and its estate.

### K.     Lease Rejection Motion

81.     Pursuant to the Lease Rejection Motion, the Debtor seeks authority to (a) reject the Leases set forth on **Exhibit 1** to **Exhibit A** to the Lease Rejection Motion, effective *nunc pro tunc* to the Petition Date, and (b) abandon the Personal Property in the Debtor's sole discretion.

82.     I believe that the rejection of the Leases is a proper exercise of the Debtor's business judgment.  The Leases, which concern Non-Core Stores that have ceased operations are not a source of potential value for the Debtor's future operations, estate, or creditors, and the potential continuing obligations for rent, tax, utility, insurance and other overhead charges related to the Leases would unnecessarily deplete the estate's assets to the detriment of other creditors.  I believe that an integral component of the Debtor's chapter 11 efforts is to optimize its business operations by, among other things, eliminating unnecessary operating costs. Rejecting the Leases for closed restaurants is a clear way to eliminate such unnecessary costs, as I understand that rejection will eliminate the Debtor's obligation to perform under the Leases and the accrual of any further obligations thereunder, such as administrative rent.  I understand that the Debtor and its management have reviewed and evaluated these unexpired Leases and have determined that it is in the best interest of the Debtor and its estate, its creditors, and all parties-in-interest for the Debtor to reject the Leases. These Leases are unexpired but are no longer of any utility to the Debtor because the Prepetition Stores located at each Lease premises has been closed and vacated as of the Petition Date.

83.     I further believe that any rejection of the Leases should be retroactive to the Petition Date.  Without a retroactive date of rejection, the Debtor could be forced to incur unnecessary administrative expenses in connection with the Leases that provide no tangible benefit to the Debtor's estate.  I believe that the counterparties to the Leases will not be prejudiced by a retroactive effective date to the Petition Date because this the Lease Rejection Motion is being served on such parties on the Petition Date via overnight mail (and being faxed and emailed to such parties to the extent fax numbers and email addresses are known), which will provide notice of the Debtor's unequivocal intent to reject the Leases as of the Petition Date.

84.     Finally, I believe it is in the best interests of the Debtor and its estate for the Debtor, in its sole discretion, to abandon the Personal Property located at the Non-Core Stores. The Debtor is currently locked out of four (4) Non-Core Stores. I understand that the Debtor may have Personal Property remaining inside those Non-Core Stores. The Debtor may intend to recover or attempt to recover such Personal Property and has reserve the right to do so in the Lease Rejection Motion. Moreover, to the extent that any personal property remaining at the Non-Core Stores from which the Debtor is locked out belong to a third-party, the Debtor is not attempting to waive the rights of such parties in connection with such property through the Lease Rejection Motion.

85.     I understand that the Debtor and its management have determined that the costs of moving and storing any Personal Property will far outweigh any benefit to the Debtor's estate. Further, any efforts by the Debtor to move or market the Personal Property could unnecessarily delay the Debtor's surrender of the Non-Core Stores and the rejection of the Leases. I therefore believe that the Debtor has satisfied the "business judgment" standard for rejecting the Leases and abandoning the Personal Property. Accordingly, I believe that the relief requested in the Lease Rejection Motion is warranted and in the best interests of the Debtor's estate, its creditors, and all other parties-in-interest.

**L.     Cash Collateral Motion**

86.     Pursuant to the Cash Collateral Motion, the Debtor will seek entry of an order authorizing the use of cash collateral as defined in section 363(a) of the Bankruptcy Code ("Cash Collateral"), providing adequate protection for its pre-petition secured lender, and modifying the automatic stay. The Debtor intends to use Cash Collateral to fund its ordinary course expenditures. I understand that the Debtor's secured lender will consent to entry of an interim

order granting the relief requested in the Cash Collateral Motion based on the forms of adequate protections set forth therein.

87.     In order to address working capital needs and fund other costs and expenses associated with its efforts to maximize value, the Debtor requires access to Cash Collateral. Without immediate access to Cash Collateral, the repercussions to the Debtor's business will be catastrophic and likely irreparable, ending its ability to function as an entity seeking to maximize value for all stakeholders.   The Debtor needs access to Cash Collateral to fund, among other things, payroll for current employees, operating expenses, and to otherwise fulfill its obligations and pay debts in the ordinary course of business.   The use of Cash Collateral will provide the Debtor with the necessary capital with which to operate during chapter 11, including funding the Debtor's obligations to its employees, and to successfully exit chapter 11.

88.     The Debtor does not currently have any available sources of working capital or financing to carry on of their business without the use of Cash Collateral.  The Debtor's ability to maximize the value of its estates is dependent on its ability to continue to proceed in an orderly fashion post-bankruptcy, and the Debtor cannot proceed in that fashion unless it can fund payments for postpetition goods, services, and other operating expenses.   Use of the Cash Collateral thus is essential to the Debtor's continued viability and the value of its assets; indeed, if interim relief is not obtained, the Debtor's assets will be immediately and irreparably jeopardized, to the detriment of their estates, their creditors, and other parties in interest.

89.     I believe that if the Cash Collateral Motion is not approved, the Debtor's only alternative will be a rapid and disorderly liquidation or conversion to chapter 7, as the Debtor will be unable to sustain operations or maximize the value of their assets during the pendency of the Chapter 11 Case.  Accordingly, I believe that the Debtor's use of Cash Collateral is

warranted, is in the best interests of the Debtor's estate, its creditors, and all other parties-in-interest, and is necessary to avoid immediate and irreparable harm to the Debtor and its estate.

### M. Duane Morris Application

90.     Pursuant to the Duane Morris Application, the Debtor seeks authority to retain Duane Morris LLP ("Duane Morris") as bankruptcy counsel, *nunc pro tunc* to the Petition Date. The Debtor has selected Duane Morris as bankruptcy counsel because Duane Morris possesses extensive knowledge and expertise in the areas of law relevant to the Chapter 11 Case, and the members of Duane Morris' Business Reorganization and Financial Restructuring group have significant experience representing debtors in chapter 11 cases. In addition, Duane Morris has been working closely with the Debtor to prepare for this Chapter 11 Case and through this work has gained extensive knowledge of the Debtor's financial affairs, capital structure, reorganization strategy, and the potential legal issues that may arise in the context of the Chapter 11 Case. I believe that Duane Morris' hourly rates are fair and reflect the experience of the professionals involved, and are reasonable given the complexity and time pressures involved in this Chapter 11 Case. Accordingly, I believe that the relief requested in the Duane Morris Application is warranted and in the best interests of the Debtor's estate, its creditors, and all other parties-in-interest.

### Conclusion

91.     To preserve the value of its business to the fullest extent possible, the Debtor's immediate objective is to maintain "business as usual" following the commencement of this Chapter 11 Case by minimizing any adverse impact of the chapter 11 filing on the Debtor's operations. For the reasons described herein and in the First Day Motions, I believe that the prospect for achieving these objections for the benefit of creditors and other stakeholders will be substantially enhanced if this Court grants the relief requested in each of the First Day Motions.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: December 2, 2015

_____
W. Craig Barber
President
Restaurants Acquisition I, LLC

## Exhibit A

**Organizational Structure Chart**

# Black-eyed Pea Restaurants
# Ownership Structure

